IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

Mary E. Luster,                          )
                                         )    Civil Action No. 6:07-3344-GRA-WMC
                    Plaintiff,           )
                                         )    **REPORT OF MAGISTRATE JUDGE**
            vs.                          )
                                         )
Michael J. Astrue,                       )
Commissioner of Social Security,         )
                                         )
                    Defendant.           )
_____  )


     This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

     The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.


**ADMINISTRATIVE PROCEEDINGS**

     The plaintiff filed applications for disability insurance benefits (DIB) and supplemental security income (SSI) benefits on September 20, 2004, respectively, alleging that she became unable to work on February 21, 2004.[2] The applications were denied initially

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

[2]On February 2, 2006, while these applications were pending, the plaintiff filed subsequent applications for DIB and SSI. These applications were denied initially and on reconsideration. They are considered duplicate claims and were consolidated with the prior applications for a consolidated decision.

and on reconsideration by the Social Security Administration.  On May 18, 2005, the plaintiff requested a hearing.  The administrative law judge (ALJ), before whom the plaintiff, her attorney, her daughter, and a vocational expert appeared on November 4, 2005, considered the case *de novo*, and on January 6, 2006, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  After receiving new and material evidence, the Appeals Council remanded the case to the ALJ for further proceedings on July 18, 2006.  A supplemental hearing was held on January 17, 2007, at which the plaintiff, her attorney, and a vocational expert appeared.  On April 24, 2007, the ALJ again denied benefits.  The ALJ's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on August 14, 2007.  The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1)    The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.
>
> (2)    The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 404.1520(b), 404.1571 et seq., 416.920(b) and 416.971 et seq.)
>
> (3)    The claimant has the following severe impairments: a history of cervical and lumbar strain, degenerative changes in her lumbar spine, arthritis in her right knee and depression (20 CFR 404.1520(c) and 416.920(c)).
>
> (4)    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> (5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work with restrictions that require no more than occasional stooping, kneeling, crouching or crawling; no balancing, no climbing of ladders, ropes or scaffolds; and, due to possible

2

medication side-effects, avoidance of hazards such as unprotected heights and dangerous machinery. She can perform simple work in a low stress environment that does no[t] require any ongoing interaction with the public.

(6)    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

(7)    The claimant was born on December 28, 1954, and was 49 years old on the alleged disability onset date, which is defined as a "younger" individual. She is now "closely approaching advanced age" at 52 years old (20 CFR 404.1563 and 416.963).

(8)    The claimant has a limited (11th grade) education and is able to communicate in English (20 CFR 404.1564 and 416.964).

(9)    The claimant acquired skills from her past work, but those skills are not transferable to other work within her residual functional capacity (20 CFR 404.1568 and 416.968).

(10)   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

(11)   The claimant has not been under a "disability," as defined in the Social Security Act, from February 21, 2004, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. §423(a). "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

3

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary.  20 C.F.R. §404.1503(a).  *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. §423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert.  *Id*.

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff completed part of the 11th grade (Tr. 93) and worked in the past as a home health aide, personal care aide, and textile spinner (Tr. 61, 427).[3] She alleged that she became disabled on February 21, 2004, when she was 48 years old (Tr. 48, 368),

---

[3]The vocational expert at the first hearing testified that the plaintiff's past work as all semi-skilled and medium in exertion as generally performed, and possibly heavy as the plaintiff performed them (Tr. 565-66).

due to multiple physical and mental impairments (Tr. 71, 94, 416, 451, 466, 488).[4]  The plaintiff was 52 years old at the time of the ALJ's post-remand decision (Tr. 48).

The record reveals that prior to the alleged disability onset date, the plaintiff sought treatment in August 2003 for pain and stiffness in her neck and back after she tried to lift a patient at work.  Dr. William K. Manning, an orthopedist, evaluated her on November 10, 2003, and diagnosed cervical and lumbar strain, plus pre-existing degenerative arthritis and degenerative disc disease in the cervical spine.  Dr. Manning limited her lifting to 40 pounds and recommended physical therapy (Tr. 134-35).  The same month, Dr. Vincent S. Toussaint noted that the plaintiff should only engage in "light work" (Tr. 179).

At a follow-up visit on January 23, 2004, Dr. Manning noted that the plaintiff was "very difficult[] to examine" and overreacted to any stimulation (Tr. 133).

On February 13, 2004 (eight days before the alleged disability onset), the plaintiff reported that her neck was better and had full range of motion in her neck and shoulders, with normal reflexes and no weakness.  As to her lower back, she had moderate muscle spasms without sensory or reflex deficits, and straight leg-raise testing was normal.  Dr. Manning noted that she "could still return to a job lifting up to 40 pounds" (Tr. 131).

On February 23, 2004 (two days after the alleged disability onset), the plaintiff told Dr. Manning that her neck was significantly better, but that she had marked back pain.  She walked without a limp and had no weakness in her lower extremities, but had moderate lumbar muscle spasms.  Straight leg-raise testing produced discomfort on the right at 60 degrees, but the plaintiff had normal reflexes and sensation.  Dr. Manning noted that she was "very difficult to evaluate," and that she would "come one visit with pain and spasm in the

---

[4]The plaintiff alleged problems with her back, neck, right knee, right shoulder and right elbow, as well as high blood pressure, sinusitis, allergies, vertigo, an inner ear disorder, migraine headaches, depression and anxiety (Tr. 71, 94, 416, 451, 466, 488).

neck and the next visit with pain and spasm in the low back." An MRI of the plaintiff's lumbar spine taken on March 9th was "essentially unremarkable for [Plaintiff's] age" and showed minimal disc bulges at L3-4 and L4-5, with mild degenerative changes. Two weeks later, on March 25th, Dr. Manning noted that the plaintiff "could still work at a job lifting up to 40 pounds" (Tr. 126-29).

On May 27, 2004, Dr. Manning determined that the plaintiff had a five percent whole person impairment (Tr. 127).

On July 13, 2004, the plaintiff presented to Dr. Rebecca E. Holdren, a pain management specialist, for a workers compensation consultation. The plaintiff complained of neck and back pain, occasional headaches, and cramping in her calves when she walked. On examination, she was alert and oriented, followed complex commands, and was slightly distressed and anxious. She had normal symmetric deep tendon reflexes, no gross muscle wasting, full 5/5 motor strength, and tenderness over her back. Dr. Holdren diagnosed cervical and lumbar strain with preexisting degenerative disc disease, prescribed pain medications and an electrical stimulator, and stated, "I agree with moderate lifting [up to] 40 lbs. as tolerated" (Tr. 200-02).

On September 14, 2004, the plaintiff sought emergency care for her right knee after a motor vehicle accident (Tr. 149-55). X-rays were negative (Tr. 150). She saw Dr. Toussaint several times over the next two months and was treated for right wrist, elbow, arm, shoulder, knee and neck pain (Tr. 172-77). He noted that her symptoms were improving (Tr. 173-74).

On September 20, 2004, the plaintiff saw Dr. Holdren's colleague, pain management specialist Dr. Navneet Gupta, to follow-up on a recent left ankle sprain. She complained of chronic generalized pain. On examination, her gait was unremarkable and she walked on her heels and toes, squatted, and performed sit-to-stand transfers without discomfort. She had no focal neurologic deficits and no lumbar trigger points. The plaintiff

7

requested a "written excuse from work," but Dr. Gupta ordered a functional capacity evaluation instead (Tr. 196-97).

The plaintiff returned to Dr. Gupta on October 21, 2004, and said she "hurt[] all over," with a pain rating of eight on a scale of one to 10.  Dr. Gupta noted that she had finished her Lortab prescription three days early and exhibited significant pain behaviors (such as walking with a very slow cadence and a stiff legged gait, and keeping her upper extremities stiff).  He also noted discrepancies during the examination with regard to her ability to abduct and flex her shoulders.  Dr. Gupta felt that the plaintiff's pain was "significantly influenced by psychological factors," and advised her to "return to work with a restriction of no lifting above 40 lbs. until next [follow-up] visit."  He observed that the plaintiff became angry when he suggested that she return to work, and that she wished to see another physician (Tr. 194-95).

On November 10, 2004, the plaintiff presented to orthopedist Dr. Daniel I. Cordas for an independent medical evaluation.  She said that her neck pain was mild compared to her lower back pain and reported decreased sensation in her left leg.  Dr. Cordas diagnosed chronic lower back pain with some neurologic symptoms but no neurologic impingement.  He assessed an 11 percent spine impairment and an eight percent whole person impairment.  He also noted that the plaintiff had significant depression and should see a mental health professional.  Regarding her work capacity, he concluded that she was "most suited for light physical work . . . with occasional force exertion of up to 20 pounds and frequent force exertion of only up to 10 pounds" (Tr. 248-50).

On November 16, 2004, Dr. Cordas completed a "Medical Questionnaire" in which he repeated the functional limitations he assessed on November 10 (Tr. 313).

On November 18, 2004, the plaintiff rated her pain as nine on a scale of one to 10, and she reported burning in her feet and numbness in her left leg. Dr. Gupta noted that from a psychological standpoint, the plaintiff "report[ed] no issues with simple activities of

8

daily living and mobility." He continued the 40-pound lifting restriction and thought a functional capacity assessment would be helpful (Tr. 193).

On November 22, 2004, the plaintiff, at the request of her attorney, presented to Randel R. Jones, Ph.D., for a consultative psychological evaluation. She complained to Dr. Jones of emotional turmoil, poor sleep and an irritable mood, alleging that her former employer had turned her clients against her and taken them away from her. The plaintiff said that she took care of her family and home, enjoyed arranging flowers and cooking, and watched television. Dr. Jones' evaluation revealed that her basic motor skills were within normal limits. The plaintiff had no difficulty comprehending or following verbal instruction or maintaining attention or concentration, and her thought processes were logical and coherent. She maintained impulse control and had an appropriate social manner. Objective testing showed impaired intellectual functioning with IQ scores ranging from 63 to 67, low average verbal skills, borderline fund of general information, average verbal reasoning, and low average ability to maintain attention and concentration. The plaintiff manifested signs of depression and anxiety and showed an "unusual degree of concern about her physical well-being and general health." Dr. Jones diagnosed major depressive disorder (single episode) and generalized anxiety disorder, which compromised her basic problem-solving skills. He found she would have low tolerance for stress and would benefit from psychiatric and psychological treatment (Tr. 138-42). In an accompanying "Medical Questionnaire" form, Dr. Jones opined that the plaintiff's pain would affect her ability to maintain concentration, persistence and pace; interact with others; and complete a normal workday or week without psychological symptom interruption; but would not affect her ability to do simple tasks, detailed tasks or complex tasks (Tr. 143).

On December 1, 2004, the plaintiff fell and sprained her right knee. At the emergency room, she walked with a "minimal" limp (Tr. 148).

On January 18, 2005, Dr. Jones wrote a letter stating that the plaintiff had a "class 3" moderate impairment from mental disorders, which suggested "significant limitations in her ability to engage in gainful activities" (Tr. 315).

The plaintiff returned to Dr. Cordas on February 15, 2005, for treatment of her right shoulder and right knee.  Dr. Cordas noted that she had a positive response on "every single subjective test" on examination, and he thought she had a chronic pain disorder.  He suggested conservative treatment (Tr. 245).

On March 8, 2005, the plaintiff saw Dr. George R. Bruce for an independent medical evaluation regarding her employment capability.  The plaintiff said she could not walk for prolonged periods, stand, bend or lift.  She walked with a limp and had limited range of motion in her neck and back, full 5/5 motor strength in all extremities, normal reflexes, and sensation, and no signs of atrophy.  Dr. Bruce thought the plaintiff's main problem was her mental status and depression; he noted her low IQ, but also noted that she attended high school and worked in the past.  He felt she was "disabled from her usual occupation," and that it was questionable whether she could be retrained (Tr. 204-06).  Dr. Bruce completed a "Clinical Assessment of Pain" checklist form in which he indicated that the plaintiff's pain would distract her from adequate performance of daily activities or work, that greatly increased pain was likely to occur, and that significant side-effects could limit her effectiveness at work and her ability to drive (Tr. 207-09).

On March 16, 2005, the plaintiff returned to Dr. Cordas and said her knee was bothering her more than her shoulder, but that she had some improvement with physical therapy.  She had good range of motion of the right knee and right shoulder, no instability in the knee, and signs of right shoulder impingement (Tr. 243).

On April 25, 2005, State agency psychologist Xanthia P. Harkness, Ph.D., reviewed the plaintiff's records and completed a "Psychiatric Review Technique" form and a "Mental Residual Functional Capacity Assessment" form.  Dr. Harkness noted that despite

the low IQ scores, the plaintiff had an 11th grade education, no history of special education, and a long work history that indicated "at least" borderline intellectual functioning and did not demonstrate mental retardation; Dr. Harkness believed that depression and anxiety may have artificially lowered her IQ scores.  She found that the plaintiff's affective, anxiety, and cognitive disorders produced mild restriction of activities of daily living and moderate difficulties in maintaining social functioning, concentration, persistence or pace.  As to specific work-related mental activities, Dr. Harkness found the plaintiff had moderately limited ability to handle detailed instructions, maintain extended attention and concentration, interact appropriately with the general public, and respond appropriately to supervisors. However, she found that the plaintiff was not significantly limited in any other area, including the ability to understand, remember, and carry out short, simple instructions; perform activities within a schedule; sustain an ordinary routine; complete a normal day or week without psychological symptom interruptions; get along with coworkers; maintain socially appropriate behavior; respond appropriately to routine changes; and be aware of hazards (Tr. 255-73).

On April 27, 2005, Dr. Cordas noted that the plaintiff's right shoulder and right knee were "feeling much better," the knee was completely asymptomatic, and there was only occasional achiness in the shoulder.  The plaintiff had full range of motion and all other shoulder signs were normal.  Dr. Cordas released her from orthopedic care (Tr. 242).

On April 28, 2005, State agency physician Dr. Frank K. Ferrell reviewed the plaintiff's records and determined that she had the physical residual functional capacity to lift 50 pounds occasionally and 25 pounds frequently; stand/walk and sit about six hours each in an eight-hour workday; occasionally crouch; and needed to avoid moderate exposure to hazards (Tr. 274-81).

The plaintiff returned to Dr. Cordas on June 10, 2005, and reported ongoing right shoulder and knee pain.  Dr. Cordas assessed right knee bursitis and right shoulder

11

tendonitis, and provided pain medication, muscle relaxants, and an electrical stimulation unit (Tr. 309).

On July 7, 2005, Dr. Jones wrote a letter stating that at his evaluation in November 2004, the plaintiff's low intelligence test scores "did not indicate the presence of mental retardation," were secondary to her depression, and were considered to be temporary. He noted that her educational and work history also did not support a primary diagnosis of mental retardation, and that the primary difficulty noted on examination was her depression, which was interfering with her problem-solving abilities (Tr. 314).

The plaintiff returned to Dr. Cordas on August 26, 2005, for right shoulder treatment. She stated that a trigger point injection to the scapula helped "quite a bit," but that she still had right shoulder and knee pain. She had tenderness on examination, but no other significant findings. Dr. Cordas diagnosed right shoulder posterior muscle spasm and right knee bursitis and tendonitis. He provided another injection to the right shoulder and, per the plaintiff's request, released her again from orthopedic care. He assessed a three percent right upper extremity impairment and a four percent right lower extremity impairment (Tr. 290).

On October 21, 2005, the plaintiff underwent a functional capacity evaluation by physical therapist Vera L. Williams. Ms. Williams summarized the results as follows:

> The evaluee demonstrated increased difficulty with especially with [sic] any task requiring her to stand for long periods of time. She demonstrated the ability to stand x15 minutes vs. 1 hour for sitting. Evaluee shifted positions continuously and kept rubbing right shoulder and neck with complaints of spasming and cramping. She demonstrated activities with guarded and stiff posture, especially with lifting or carrying 10 lbs. during activities. In reference to over all ROM [range of motion] and Strength, there was some inconsistency comparing AROM [active range of motion] vs. PROM [passive range of motion] observing left and right shoulders. Evaluee appeared to demonstrate an underdetermined effort with overall mobility and strength as noted with PROM results. Overall level according to evaluation is Sedentary. In reference to overall PDC [physical demand

12

characteristics] level for activities, the level was noted as
Occasional.

(Tr. 333).

On December 12, 2005, Dr. Cordas completed four different assessments
concerning the plaintiff's functional limitations. First, he completed a "Fibromyalgia Residual
Functional Capacity Questionnaire" (Tr. 336-40), in which he did not state whether the plaintiff
met the criteria for fibromyalgia. He listed her symptoms as multiple tender points, chronic
fatigue, and muscle weakness, and noted that her pain would frequently interfere with the
attention and concentration needed to perform simple work tasks. He noted that she was
capable of low stress jobs, and that her medications might cause dizziness and difficulty
concentrating. In Dr. Cordas' opinion, the plaintiff could walk two to three blocks at a time,
sit one hour at a time for a total of two hours, and stand one hour at a time for a total of less
than two hours in an eight-hour workday. He also stated that she would need to change
positions at will and take four or five unscheduled breaks per day. He further found the
plaintiff could lift 10 pounds occasionally; rarely twist, climb, and hold her head in a static
position; and never stoop, crouch, look down, or turn her head to the right or left. He also
assessed restrictions on handling, fine manipulation, and reaching, and said that the plaintiff
would miss four days of work per month. He stated that the earliest beginning date for these
limitations was August 22, 2003[5] (Tr. 336-40).

---

[5]There has been some confusion about the significance of the August 22, 2003 date, as it
appears right next to Dr. Cordas' signature at the end of the document. The Appeals Council stated
in its order of remand that the form was completed on that date (Tr. 397), and the ALJ stated the
same thing in his post-remand decision (Tr. 25). However, it is doubtful that August 22, 2003, could
be the date the form was completed. Rather, August 22, 2003, was the date the plaintiff first injured
her back at work when lifting a patient (Tr. 135). Dr. Cordas did not begin seeing the plaintiff until
November 10, 2004 (Tr. 248-50). Thus, when looking at the opinion, it appears that he wrote
"August 22, 2003" in response to the question immediately above the signature line, which asked,
"What was the earliest date the description of symptoms and limitations on this questionnaire
applies?"

13

Second, Dr. Cordas completed a "Medical Opinion Regarding Physical Capacity to Work" form, in which he found that the plaintiff was limited to sedentary work (Tr. 341).

Third, Dr. Cordas completed a "Clinical Assessment of Pain" form, in which he found that the plaintiff's pain would be distracting at work, greatly increased pain was likely to occur, and significant side-effects could be expected to limit her effectiveness, but that the pain and side effects would not produce limitations to such a degree as to create serious problems in performing her previous work activities (Tr. 342-43).

Fourth, Dr. Cordas completed a "Medical Opinion re: Ability to Do Work-Related Activities (Physical)" form, in which he found that the plaintiff could lift 10 pounds occasionally; stand 45 minutes at a time (less than two hours total) and sit one hour at a time (two hours total) during an eight-hour day; never stoop or crouch; and occasionally twist and climb (Tr. 345-47).

On June 12, 2006, the plaintiff underwent a consultative psychological evaluation by Ron O. Thompson, Ph.D., in connection with her applications for benefits. She said she was applying for disability benefits due to pain. On mental status examination, she followed simple directions, responded accordingly, made simple cash transactions, had coherent speech, and demonstrated intellect within the low normal range. She exhibited poor attention, concentration, and short-term memory. The plaintiff denied having any difficulties learning at school. Her activities included light housework, cooking while sitting on a stool, driving to the store, and watering her flowers. Dr. Thompson diagnosed a moderate affective disorder with major depressive features and a pain disorder associated with psychological factors and general medical condition. He said that the plaintiff had a moderate concentration deficiency and "likely would have difficulty attending to simple tasks for a prolonged period of time without becoming distracted, possibly causing incompletion of tasks and error proneness" (Tr. 349-52).

14

The plaintiff returned to Dr. Cordas on July 15, 2005, and said her right knee felt better since her last injection. She was tender over the right shoulder, but neurovascularly intact. Her knee was not tender and there was no crepitus (popping sound). Dr. Cordas assessed improved bursitis and continued muscle spasm with a trigger point in the right shoulder girdle. He provided a trigger point injection to her shoulder (Tr. 359).

In a daily activity questionnaire completed in March 2005, the plaintiff reported that she required help with bathing, had difficulty sleeping, did not prepare meals or do household chores, and no longer engaged in recreational or social activities (Tr. 81-82). She indicated that she could drive up to 20 miles if necessary (Tr. 84).

In an affidavit dated October 14, 2005, the plaintiff stated that she had to alternate between sitting and standing (Tr. 325). She also stated that she could not do any housework involving bending, stooping or standing for long periods, and that she was forgetful and depressed (Tr. 326).

At the post-remand hearing on January 17, 2007, the plaintiff testified that she could lift five or six pounds (Tr. 575), stand 12 minutes at a time (Tr. 580), had difficulty balancing (Tr. 577), did not use a cane (Tr. 578), and had back pain with pushing and pulling (Tr. 578). She said that her face swelled from sinus problems (Tr. 576-77). The plaintiff testified that she cooked, but was forgetful from medication (Tr. 578). She complained of concentration problems (Tr. 579), and said she could not think straight (Tr. 580). On a typical day she would "[j]ust lay around" (Tr. 582). She rated her back pain as a 10 on a scale of one to 10 (Tr. 583).

The ALJ asked vocational expert Carey Alexander Washington the following hypothetical question:

> Assume an individual who's limited to light exertional work as defined in the regulations and assume an individual the claimant's education, past job experience with the restrictions as follows. Because of depression, the side-effects of medications and because of pain is limited to simple routine work, a low

15

> stress environment and that's what I define as requiring few decisions, no ongoing interaction with the public, no balancing, occasional stooping, kneeling, crouching, and crawling, no ladders, no ropes, no scaffolds. Again because of dizziness and side-effects of medications the avoidance of hazards such as unprotected heights and dangerous machinery. Now based on this profile would there be jobs available this individual could perform and if so would you provide examples of such and the approximate numbers present and DOT[6] numbers if you have them?

(Tr. 584-85). Mr. Washington testified that the individual could perform the representative light unskilled jobs of marker (DOT 209.587-034, 175,000 jobs nationally), which would allow the individual to alternate sitting and standing at will, poultry boner (DOT 525.687-066, 150,000 jobs nationally), and assembler (DOT 706.687-010, 225,000 jobs nationally) (Tr. 585-86). In response to questions by her attorney, Mr. Washington testified that the ability to work only four hours per day would preclude substantial gainful employment (Tr. 587).

## ANALYSIS

The plaintiff alleges disability since February 21, 2004, when she was 48 years old, due to cervical and lumbar strain, degenerative changes in her lumbar spine, arthritis in her right knee, depression, chronic pain disorder, anxiety, and mental retardation. She has past relevant work as a nurse's aide and textile worker. The ALJ found that the plaintiff retained the residual functional capacity ("RFC") to perform light work with restrictions that require no more than occasional stooping, kneeling, crouching or crawling; no balancing, no climbing of ladders, ropes or scaffolds; avoidance of hazards such as unprotected heights and dangerous machinery; and simple work in a low stress environment that does no[t] require any ongoing interaction with the public. The plaintiff argues that the ALJ erred by (1) failing to abide by the Appeals Council's remand order to obtain additional medical evidence

---

[6]U.S. Dep't of Labor, *Dictionary of Occupational Titles* (4th ed., Rev. 1991) ("DOT").

16

and/or clarification from Dr. Cordas, her treating orthopaedic surgeon, or in the alternative, obtain evidence from another medical expert to clarify the nature and severity of her impairments; (2) failing to properly consider her mental impairments in determining her residual functional capacity; and (3) posing an improper question to the vocational expert.

### Remand Order

The plaintiff argues that the ALJ failed to follow the mandate of the Appeals Council to obtain a clarification of her residual functional capacity from Dr. Cordas, the treating orthopaedic physician. Dr. Cordas performed an independent medical examination of the plaintiff on November 10, 2004. He assessed an 11% spine impairment and an 8% whole person impairment. He also noted that the plaintiff had significant depression and should see a mental health professional. Regarding her work capacity, he concluded that she was "most suited for light physical work . . . with occasional force exertion of up to 20 pounds and frequent force exertion of only up to 10 pounds" (Tr. 248-50). Dr. Cordas treated the plaintiff from November 10, 2004, to August 26, 2005 (Tr. 336). The record contains the treatment notes from that time period (Tr. 242-45, 248-50, 290, 309, 313).

Following the ALJ's first decision, the plaintiff requested review by the Appeals Council and submitted new evidence to the Appeals Council. The new evidence contained four different assessments by Dr. Cordas concerning the plaintiff's functional limitations. First, he completed a "Fibromyalgia Residual Functional Capacity Questionnaire" (Tr. 336-40), in which he stated the plaintiff could walk two to three blocks at a time, sit one hour at a time for a total of two hours, and stand one hour at a time for a total of less than two hours in an eight-hour workday. He also stated that she would need to change positions at will and take four or five unscheduled breaks per day. He further found the plaintiff could lift 10 pounds occasionally; rarely twist, climb, and hold her head in a static position; and never stoop, crouch, look down, or turn her head to the right or left. He also assessed restrictions

on handling, fine manipulation, and reaching, and said that the plaintiff would miss four days of work per month (Tr. 336-40).

Second, Dr. Cordas completed a "Medical Opinion Regarding Physical Capacity to Work" form, dated December 12, 2005, in which he found that the plaintiff was limited to sedentary work (Tr. 341). Third, Dr. Cordas completed a "Clinical Assessment of Pain" form, dated December 12, 2005, in which he found that the plaintiff's pain would be distracting at work, greatly increased pain was likely to occur, and significant side effects could be expected to limit her effectiveness, but that the pain and side effects would not produce limitations to such a degree as to create serious problems in performing her previous work activities (Tr. 342-43). Fourth, Dr. Cordas completed a "Medical Opinion re: Ability to Do Work-Related Activities (Physical)" form, dated December 12, 2005, in which he found that the plaintiff could lift 10 pounds occasionally; stand 45 minutes at a time (less than two hours total) and sit one hour at a time (two hours total) during an eight-hour day; never stoop or crouch; and occasionally twist and climb (Tr. 345-47).

The Appeals Council stated as follows in its remand order (in pertinent part):

• The [ALJ] found that the claimant's limitations as a result of her severe impairments . . . did not preclude her form performing a range of light work related activities . . . . New and material evidence from Daniel Cordas, M.D., has been received by the Appeals Council. This evidence, a fibromyalgia questionnaire and medical source statement . . . has not been considered by the [ALJ]. However, the new evidence is not accompanied by updated treatment evidence from Dr. Cordas as the most current evidence from him dates from June 2005 in which he limited the claimant to lifting up to 20 pounds (Exhibit 16F). The new evidence indicates the claimant was seen seven times through August 26, 2005, but the questionnaire is dated August 22, 2003. Further development is needed.

Upon remand, the [ALJ] will:

• Give further consideration to the claimant's maximum residual functional capacity. . . . As appropriate, the [ALJ] will request the treating source to provide additional evidence and/or further

clarification of the opinions and medical source statements about what the claimant can still do despite the impairments.

• Further, if necessary, obtain evidence from a medical expert to clarify the nature and severity of the claimant's impairments. . . .

• If warranted, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base. . . . In compliance with the above, the [ALJ] will offer the claimant an opportunity for a hearing, address the evidence which was submitted with the request for review, take any further action needed to complete the administrative record, and issue a new decision.

(Tr. 397-98).

Upon remand, the ALJ gave "no weight to these forms completed by Dr. Cordas months after he last examined the claimant" (Tr. 25). The ALJ pointed out that Dr. Cordas had not seen the plaintiff since August 2005, that he never referenced fibromyalgia (nor is there any diagnosis of it in the record) even though he completed a questionnaire geared toward fibromyalgia patients, and that he previously assessed only very low impairment ratings regarding the plaintiff's spine (11%), right upper extremity (3%), right lower extremity (4%) and whole body (8%) (Tr. 25). The ALJ concluded that Dr. Cordas' most recent opinions were not supported by his own treatment notes or impairment ratings, nor were they consistent with the opinions of the other examining and treating sources (Tr. 25).

The plaintiff argues that the ALJ failed to obtain clarification of her residual functional capacity from Dr. Cordas and that if the ALJ failed to recontact Dr. Cordas, he was required to obtain medical expert testimony instead. The defendant argues that the record before the ALJ was complete and unambiguous, and thus the ALJ was not required to recontact Dr. Cordas or obtain medical expert testimony (Tr. 398). However, it appears to this court that Dr. Cordas' opinion, as the plaintiff's treating orthopaedic surgeon, does require clarification as noted by the Appeals Council. Accordingly, upon remand, the ALJ should be instructed to obtain updated additional medical evidence and/or clarification from Dr. Cordas

19

as to his opinion – and the basis for his opinion – of the plaintiff's residual functional capacity.

Further, the plaintiff contends that clarification is needed on the date beside the signature of

Dr. Cordas on the "Fibromyalgia Residual Functional Capacity Questionnaire" (Tr. 336-40).

The date beside his name is August 22, 2003; however, Dr. Cordas did not begin seeing the

plaintiff until November 10, 2004 (Tr. 248-50).   The plaintiff first injured her back on

August 22, 2003, when lifting a patient at work (Tr 135).   The August 22, 2003, date thus

appears to be in response to the question immediately above the signature line, which asked

"What was the earliest date the description of symptoms and limitations on this questionnaire

applies?" (Tr. 340).   Upon remand, the ALJ should obtain clarification from Dr. Cordas as to

the date on the fibromyalgia questionnaire (Tr. 336-40).   Further, in the event the ALJ is

unable to secure sufficient information from Dr. Cordas, the ALJ should obtain a consultative

examination of the plaintiff to clarify the nature and severity of the plaintiff's impairments.


***Residual Functional Capacity***

The plaintiff next argues that the ALJ erred by failing to address her mental

impairments in terms of work-related functions.

> The Residual Functional Capacity ("RFC") assessment must
> include a narrative discussion describing how the evidence
> supports each conclusion, citing specific medical facts (e.g.,
> laboratory findings) and nonmedical evidence (e.g., daily
> activities, observations). In assessing RFC, the adjudicator must
> discuss the individual's ability to perform sustained work
> activities in an ordinary work setting on a regular and continuing
> basis (i.e., 8 hours a day, for 5 days a week, or an equivalent
> work schedule), and describe the maximum amount of each
> work- related activity the individual can perform based on the
> evidence available in the case record. The adjudicator must also
> explain how any material inconsistencies or ambiguities in the
> evidence in the case record were considered and resolved. . . .

SSR 96-8p, 1996 WL 374184, *7.

In a disability case, the combined effect of all the claimant's impairments must be considered without regard to whether any such impairment if considered separately would be sufficiently disabling.  Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's 'ability to engage in substantial gainful activity.'" *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974).  The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity.  *Id.*  The cumulative or synergistic effect of the various impairments on the claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

"As with exertional capacity, nonexertional capacity must be expressed in terms of work- related functions."  SSR 96-8p, 1996 WL 374184, *6.  "Work-related mental activities generally required by competitive, remunerative work include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting."  *Id.*

The ALJ found that the plaintiff's depression was a severe impairment and noted that several examiners stated the plaintiff "appeared depressed and that depression and/or 'psychological factors' influenced her pain" (Tr. 22, 26).  The ALJ considered the plaintiff's degree of functional limitation in four broad functional areas and determined that the plaintiff had no more than a mild restriction of her activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace on complex tasks and detailed instructions, but she should be able to attend to and perform simple tasks throughout the work day for at least two hours at a time with normal work breaks and without special supervision; and no episodes of decompensation (Tr. 280).  The ALJ determined that "[t]he effect of these limitations is to

21

further restrict the claimant's residual functional capacity to the performance of simple, routine work in a low stress environment involving no ongoing interaction with the general public" (Tr. 280).

In assessing the plaintiff's mental residual functional capacity, the ALJ properly considered the objective medical evidence and the varying opinions, as well as the credibility of the plaintiff's subjective complaints regarding her mental limitations. He noted her lack of treatment by a mental health professional and the varying assessments of the medical sources. He referenced the numerous inconsistencies in her presentation to different physicians and psychologists. He noted that while anti-anxiety and antidepressant medications were prescribed, there was no evidence to suggest that they were not effective or to indicate adverse side-effects from those particular medications. He also observed the fact that the plaintiff did not demonstrate significant memory problems at the administrative hearing (Tr. 27).

The ALJ's mental RFC determination was supported by Dr. Jones' evaluation of the plaintiff wherein he found the plaintiff had no difficulty comprehending or following verbal instruction or maintaining attention or concentration, her thought processes were logical and coherent, she maintained impulse control, and she had an appropriate social manner (Tr. 139). Also, Dr. Thompson's evaluation revealed the plaintiff followed simple instructions, responded accordingly, made simple cash transactions, had coherent speech, and demonstrated intellect within the "low normal" range (Tr. 349). Dr. Thompson determined that her depression and concentration deficiency were of moderate severity (Tr. 352). The ALJ's finding was also supported by Dr. Jones' statement in November 2004 that the plaintiff's impairments would affect her in various ways – i.e.., problem-solving and stress tolerance – but would not affect her ability to perform simple, detailed or complex tasks (Tr. 142-43). The ALJ's determination was further supported by one of Dr. Cordas' statements issued in December 2005, wherein he stated that the plaintiff's pain and medication side

22

effects would not create serious problems in the performance of her previous work activities (Tr. 342-43). Additionally, the ALJ's determination was supported by Dr. Harkness' review of the record and determination that the plaintiff had mild to moderate functional limitations and was not significantly limited in her ability to handle simple instructions, sustain a schedule and routine, complete a normal day and workweek, get along with coworkers, maintain socially appropriate behavior, and respond to changes (Tr. 255-56, 270). Based upon the foregoing, this court finds that the ALJ appropriately addressed the plaintiff's mental impairments in determining her RFC.

### Hypothetical Question

The plaintiff argues that the ALJ erred in posing an improper hypothetical question to the vocational expert. The ALJ gave the following hypothetical question:

> Assume an individual who's limited to light exertional work as defined in the regulations and assume an individual the claimant's education, past job experience with the restrictions as follows. Because of depression, the side-effects of medications and because of pain is limited to simple routine work, a low stress environment and that's what I define as requiring few decisions, no ongoing interaction with the public, no balancing, occasional stooping, kneeling, crouching, and crawling, no ladders, no ropes, no scaffolds. Again because of dizziness and side-effects of medications the avoidance of hazards such as unprotected heights and dangerous machinery. Now based on this profile would there be jobs available this individual could perform and if so would you provide examples of such and the approximate numbers present and DOT numbers if you have them?

(Tr. 584-85). The vocational expert testified that the individual could perform the representative light unskilled jobs of marker (DOT 209.587-034, 175,000 jobs nationally), which would allow the individual to alternate sitting and standing at will, poultry boner (DOT 525.687-066, 150,000 jobs nationally), and assembler (DOT 706.687-010, 225,000 jobs nationally) (Tr. 585-86). In response to questions by her attorney, the vocational expert

testified that the ability to work only four hours per day would preclude substantial gainful employment ( Tr. 587).

"[I]n order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (citation omitted).

The plaintiff argues that "[b]y asking the hypothetical in the manner in which he did, the ALJ negated the purpose of having a vocational expert testify at the hearing" (pl. brief 10). The plaintiff argues that the question did not set out the plaintiff's abilities and limitations and rather just assumed the light work limitation. *See Walker*, 889 F.2d at 51 ("In this case the ALJ did not ask questions that ensured that the vocational expert knew what the claimant's abilities and limitations were. Therefore, his answers to those questions were not particularly useful."). This court agrees. Upon remand, the ALJ should be instructed to obtain vocational expert testimony in response to hypothetical questions setting out all of the plaintiff's impairments, both exertional and nonexertional.

### CONCLUSION AND RECOMMENDATION

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

_____
WILLIAM M. CATOE
UNITED STATES MAGISTRATE JUDGE

October 31, 2008
Greenville, South Carolina

24